IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

VAN HANG HEANG,                          )        No. C 07-0980 JSW (PR)
                                          )
            Petitioner,                   )        **ORDER DENYING**
                                          )        **PETITION FOR WRIT OF**
     v.                                   )        **HABEAS CORPUS**
                                          )
ROBERT HOREL, Warden,                     )
                                          )
            Respondent.                   )
_____ )

## INTRODUCTION

Petitioner, a prisoner of the State of California currently incarcerated at Pelican Bay State Prison, has filed a pro se Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254. This Court ordered Respondent to show cause why a writ should not be granted. Respondent filed an Answer, memorandum and exhibits in support thereof. For the reasons stated below, the Petition is denied.

## PROCEDURAL BACKGROUND

On May 29, 2003, a jury found Petitioner guilty of conspiracy to obstruct justice, capital murder with special circumstances for lying-in-wait, and conspiracy to commit murder. The jury found true enhancements for committing the offenses for a gang purpose, and personally using a firearm to inflict death. The jury also found Petitioner suffered three prior strike convictions, a prior serious felony conviction, and a prior prison term.

On September 5, 2003, the state trial court sentenced Petitioner to a term of

life without the possibility of parole, plus twenty-five years to life, plus five years in state prison.

On August 4, 2005 the California Court of Appeal affirmed Petitioner's conviction.  On November 16, 2005, the California Supreme Court denied Petitioner's petition for review.  Petitioner filed the instant Petition on February 15, 2007.

## **FACTUAL BACKGROUND**

The facts underlying the charged offenses, as found by the California Court of Appeal, are summarized in relevant part, as follows:

Around 8:00 p.m. on October 23, 1998, Dong Dinh's doorbell rang and his wife asked him to answer it.  When he did, he was shot five times.  Two of the shots entered his abdomen at a downward angle causing lethal internal injuries.

Police immediately suspected that the killing was related to the then in-progress testimony of Dong's son, Truong Dinh (Kid), a member of the Asian Boys[1] gang, in the trial of seven leaders of that gang for multiple counts of murder and attempted murder. . . . Two years earlier, Kid had testified before the Los Angeles grand jury which handed down the indictment on which the Van Nuys Seven were being tried.

. . . In 1995 and 1996, Los Angeles authorities investigated a series of murders and attempted murders believed to have been committed by the Asian Boys in 1994 and 1995.  In 1996, several gang members under police surveillance, including Kid, committed a drive-by shooting of a group of rival gang members, which led to the arrest of Kid and several of the gang leaders and participants in the shooting.

Kid and a fellow arrestee, Asian Boy member Paolo Prada, secretly began cooperating with the prosecution and provided evidence against the gang leadership.  Kid's testimony was critical evidence supporting the indictments, and without his and Prada's testimony, the prosecution would not have had a case against the Van Nuys Seven.

. . . .

_____

[1]The referenced gang is more commonly referred to as the Asian Boyz gang.

Ty Pham, a former gang member already serving a Three Strikes sentence for multiple robberies, had become a jailhouse informant in hopes of getting his sentence reduced, and had been transferred to the Los Angeles County jail in 1997. . . .

. . . .

A couple of months after the killing of Dong Dinh, defendants Heang and Touch were arrested and brought into the Los Angeles County jail.  Heang was arrested first in late December 1998 for a parole violation for possessing a machete.  He was put in the same module as Pham.  Pham remembered that he was nervous and jumpy and walked "back and forth, pacing the cell."

. . . .

. . . Heang began talking to Ty Pham about the parole violation and expressed apprehension that he had been picked up for something that happened in San Jose.  Heang said, "it's all 'cause of this fucking Kid," referring to the fact that Kid had testified against the gang.  A short time later, Touch was arrested and put in the same module.  He told Pham he was in jail for allegedly making a terrorist threat to the mother of someone he was trying to initiate into the gang. . . .

Pham used a ruse to get Heang and Touch to reveal details of the Dinh murder.  Pham told them "the fiction" that "Billy," who is a real person who was connected to card rooms and gambling in the Los Angeles area and closely connected to the Asian gang community, had offered to pay $30,000 for the killing of Kid's family, and that someone had claimed the reward for the murder.  Heang responded, "Bullshit."  He said he had committed the killing and wanted the money.  He swore on his mother's grave that he was telling the truth.  Pham told Heang that if he wanted Pham to try to convince Billy to pay Heang instead of the pretender, Heang had to give Pham the details of the murder.  Heang wrote on a piece of paper ".380," "five times" pointing to his chest, and "[e]xactly at 8:00." (Heang thereafter flushed the paper down the toilet.)

Heang said he did the crime "from the heart ... for the homey" and that it occurred on a Friday night at 8:00 p.m. in San Jose near Landess and Coralwood or Camberwood. (Touch told Pham the killing took place on a Thursday.)

Pham reported that Heang said that he and Touch and a couple of other guys drove up to San Jose in Gooder's green Honda Civic.  Touch added that they were getting a lot of pressure from gang leaders to do the job.

3

1
2
3
4
5
6

       Heang and Touch stated that when they went to San Jose to kill Kid, they drove around looking for him, but when they could not find Kid they went to his house.  The lights were out, so they cruised around and came back and waited.  When they were sure someone was home, they told Gooder to get ready with the car.  Heang and Touch approached the house wearing postal workers' uniforms. . . . Touch was carrying a package and both were armed.  When the door opened, Heang began firing.  Heang said that if he had to, he would kill the whole Dinh family to bring Kid out.  Heang had people ready to watch for Kid at his father's funeral.

7
8
9
10
11
12
13

       According to Pham, Heang and Touch said they had made three other trips to San Jose to find Kid to kill him.[2]  On the first trip, they took Touch's Honda Accord which had a sticker, "got rice?" on the back.  On the second trip, they drove Heang's sister's brown Toyota Cressida which overheated and which they left by the side of the road.  The Toyota was impounded, but they paid a fine and had it towed home.  Nhan Truong (Dreamer) picked them up and drove them to a pool hall and café where they found Kid's brother, Johnny.  Dreamer talked Heang out of killing the Dinh family on that trip.  Seven months later, they made the third trip during which Dong Dinh was killed.

14
15
16
17
18

       On January 5, 1999, Pham reported what he had heard to Deputy Soop. When he told Soop about the ".380, five times," Soop said, "Bingo." Pham denied that Soop told him what kind of information he wanted. Soop told him not to ask questions.  Pham did not remember if he initially provided information as to individuals other than Heang and Touch in regard to the Dinh killing. . . .

19
20
21
22
23
24

       On April 8, 1999, Pham was interviewed by Detective John Edwards and his partner.  Also present were Soop and Los Angeles County Deputy District Attorney Greg Dohi.  Pham made statements generally consistent with his trial testimony, but he did deny telling Detective Higgins on February 25, 2000, that Touch and Heang told him they drove to San Jose on Highway 5 in Heang's brother's Camry.  Pham also did not remember telling the detective that five people had gone on that trip.  Pham also denied telling Higgins that Dong Dinh was shot five times with a chrome .38-caliber gun. . . .

25
26
27

       At trial, Pham denied trying to bribe a guard in 2000 with the promise of $80,000 if he helped Pham escape from the Alhambra City jail where Pham was booked under a false name.  During his time there, Pham stole $400 from another inmate, but was not

28

---

[2]The facts from the Court of Appeal decision demonstrate that the defendants in fact made three trips *in total* and that Dinh was killed on the third trip.

4

1  charged.  Pham denied obtaining booking and bail information on
2  Taiwanese inmates and using that information to have their personal
   property stolen from jail.

3
*People v. Heang.* No. H026710, 2005 WL 1840012 (Cal. Ct. App.  Aug.  4, 2005),
4  at *1-5 (footnotes omitted).

5                    **STANDARD OF REVIEW**

6         This Court may entertain a Petition for a Writ of Habeas Corpus "on behalf

7  of a person in custody pursuant to the judgment of a state court only on the ground

8  that he is in custody in violation of the Constitution or laws or treaties of the

9  United States."  28 U.S.C. § 2254(a).  The Petition may not be granted with respect

10 to any claim that was adjudicated on the merits in state court unless the state

11 court's adjudication of the claim:  "(1) resulted in a decision that was contrary to,

12 or involved an unreasonable application of, clearly established Federal law, as

13 determined by the Supreme Court of the United States; or (2) resulted in a decision

14 that was based on an unreasonable determination of the facts in light of the

15 evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

16        Under the "contrary to" clause, a federal habeas court may grant the writ if

17 the state court arrives at a conclusion opposite to that reached by the Supreme

18 Court on a question of law or if the state court decides a case differently than the

19 Supreme Court has on a set of materially indistinguishable facts.  *Williams v.*

20 *Taylor,* 529 U.S. 362, 412-13 (2000).

21        Under the "unreasonable application" clause, a federal habeas court may

22 grant the writ if the state court identifies the correct governing legal principle from

23 the Supreme Court's decision but unreasonably applies that principle to the facts of

24 the prisoner's case.  *Williams,* 529 U.S. at 413.  As summarized by the Ninth

25 Circuit:  "A state court's decision can involve an 'unreasonable application' of

26 federal law if it either 1) correctly identifies the governing rule but then applies it

27 to a new set of facts in a way that is objectively unreasonable, or 2) extends or fails

28 to extend a clearly established legal principle to a new context in a way that is

                                    5

1   objectively unreasonable." *Van Tran v. Lindsey*, 212 F.3d 1143, 1150 (9th Cir.

2   2000) (citing *Williams*, 529 U.S. at 405-07), *overruled in part on other grounds by*

3   *Lockyer v. Andrade*, 538 U.S. 63 (2003).

4           "[A] federal habeas court may not issue the writ simply because that court

5   concludes in its independent judgment that the relevant state court decision applied

6   clearly established federal law erroneously or incorrectly.  Rather, that application

7   must also be unreasonable." *Williams*, 529 U.S. at 411; *accord Middleton v.*

8   *McNeil*, 541 U.S. 433, 436 (2004) (per curiam) (challenge to state court's

9   application of governing federal law must be not only erroneous, but objectively

10  unreasonable); *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam)

11  ("unreasonable" application of law is not equivalent to "incorrect" application of

12  law).

13          In deciding whether the state court's decision is contrary to, or an

14  unreasonable application of clearly established federal law, a federal court looks to

15  the decision of the highest state court to address the merits of a petitioner's claim

16  in a reasoned decision.  *LaJoie v. Thompson,* 217 F.3d 663, 669 n.7 (9th Cir.

17  2000).  If the state court only considered state law, the federal court must ask

18  whether state law, as explained by the state court, is "contrary to" clearly

19  established governing federal law.  *Lockhart v. Terhune*, 250 F.3d 1223, 1230 (9th

20  Cir. 2001); *see, e.g., Hernandez v. Small*, 282 F.3d 1132, 1141 (9th Cir. 2002)

21  (state court applied correct controlling authority when it relied on a state court case

22  that quoted the Supreme Court for a proposition that was squarely in accord with

23  controlling authority).  If the state court, relying on state law, correctly identified

24  the governing federal legal rules, the federal court must ask whether the state court

25  applied them unreasonably to the facts.  *Lockhart*, 250 F.3d at 1232.

## DISCUSSION

### I.      Exclusion of Impeachment Evidence

28          Petitioner claims that he was deprived of his Sixth Amendment right to

6

confrontation because the trial court refused to admit evidence of a kidnapping/extortion scheme in San Marino that may have been orchestrated by Ty Pham while he was in the Los Angeles County Jail. Petitioner also claims that the exclusion of evidence of Pham's manipulation of the prosecution in a separate criminal case against Phongsavath Chaleunsouk violated his rights under the Confrontation Clause because the exclusion of this evidence violated his right to effectively cross-examine Pham. Petitioner is not entitled to federal habeas relief on these claims.

A.   <u>Legal Standard</u>

The Confrontation Clause of the Sixth Amendment provides the accused in criminal cases the right to "be confronted with witnesses against him." U.S. Const. Amend. VI. The federal confrontation right applies to the states through the Fourteenth Amendment. *See Pointer v. Texas*, 380 U.S. 400, 403 (1965). It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. *Id*. at 404; *see Davis v. Alaska*, 415 U.S. 308, 315-16 (1974) (a primary interest secured by the Confrontation Clause is the right of cross-examination). The Clause thus reflects a judgment, not only about the desirability of reliable evidence, but about how reliability can best be determined. *Crawford v. Washington*, 541 U.S. 36, 61 (2004); *see*, *e.g.*, *United States v. Medjuck*, 156 F.3d 916, 919 n.1 (9th Cir. 1998) (Confrontation Clause serves purposes of ensuring that witnesses will testify under oath, forcing witnesses to undergo cross-examination, and permitting the jury to observe the demeanor of witnesses.); *Wood v. Alaska*, 957 F.2d 1544, 1549 (9th Cir. 1992) (the right to confrontation includes the right to cross-examine adverse witnesses and to present relevant evidence).

The right of confrontation "means more than being allowed to confront the witness physically." *Davis v. Alaska,* 415 U.S. 308, 315 (1974). " 'The main and essential purpose of confrontation is to secure for the opponent the opportunity of

cross-examination.' "  *Id.* at 315-16.  Furthermore,  "[t]he exposure of a witness'

motivation in testifying is a proper and important function of the constitutionally

protected right of cross-examination."  *Id.* at 316-17 (citing *Greene v. McElroy*,

360 U.S. 474, 496 (1959)).

It does not follow, however, that the Confrontation Clause prevents a trial

judge from imposing limits on defense counsel's inquiry into the potential bias of a

prosecution witness.  *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).  On the

contrary, trial judges retain wide latitude insofar as the Confrontation Clause is

concerned to impose reasonable limits on such cross-examination based on

concerns about, among other things, harassment, prejudice, confusion of the

issues, the witness' safety, or interrogation that is repetitive or only marginally

relevant.  *Id.*  The Constitution prohibits the exclusion of defense evidence under

rules that serve no legitimate purpose or that are disproportionate to the ends that

they are asserted to promote.  *Holmes v. South Carolina*, 547 U.S. 319, 326

(2006).  But, well-established rules of evidence permit trial judges to exclude

evidence if its probative value is outweighed by certain other factors such as unfair

prejudice, confusion of the issues, or potential to mislead the jury.  *Id.*  Therefore,

the Confrontation Clause guarantees an *opportunity* for effective

cross-examination, not cross-examination that is effective in whatever way, and to

whatever extent, the defense might wish.  *Delaware v. Fensterer*, 474 U.S. 15, 20

(1985) (per curiam) (emphasis in original).

A defendant meets his burden of demonstrating a Confrontation Clause

violation by showing that "[a] reasonable jury might have received a significantly

different impression of [a witness'] credibility . . . had counsel been permitted to

pursue his proposed line of cross-examination."  *Van Arsdall*, 475 U.S. at 680;

*Slovik v. Yates,* 556 F.3d 747, 753 (9th Cir. 2009).  The focus of this inquiry "must

be on the particular witness, not on the outcome of the entire trial."  *Van Arsdall*,

475 U.S. at 680.

8

Confrontation Clause claims are subject to harmless error analysis. *United States v. Nielsen*, 371 F.3d 574, 581 (9th Cir. 2004); *see also United States v. Allen*, 425 F.3d 1231, 1235 (9th Cir. 2005). For purposes of federal habeas corpus review, the standard applicable to Confrontation Clause violations is whether the inadmissible evidence had an actual and prejudicial effect upon the jury. *See Hernandez v. Small*, 282 F.3d 1132, 1144 (9th Cir. 2002) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

**B.    Analysis**

Pham's testimony for the prosecution established that Petitioner had made a detailed confession about the murder of Dinh. During the trial, the court allowed the defense to cross examine Pham with substantial evidence to impeach his credibility. The jury learned of Pham's five prior felony convictions, as well as an attempt Pham made to bribe a correctional officer to help him escape from jail, and an incident where Pham stole $400 from another inmate and was caught but never charged with a crime. Respondent's Exhibit 1, Reporter's Transcript, (hereinafter "RT") at 5210-11, 5369, 5370. The jury also learned of the benefits Pham received for being an informant; that Pham was made a jail trustee which meant he had more "freeway" time outside his cell, additional shower and phone privileges, and occasionally received a food from the deputies. *Id.* at 5428. The jury also learned that previously, during the sentencing phase of Pham's conviction for robbery, the court struck one of his prior convictions because of his cooperation with law enforcement on other cases. *Id.* at 5362-66. Additionally, the jury learned of the repeated demands that Pham made to the prosecutors in exchange for being an informant. *Id*. at 5356. Finally, the jury heard testimony that Pham's former girlfriend was raped by two members of the Asian Boys gang. *Id.* at 5386-89.

The trial court precluded the defense from impeaching Pham with two contested accusations of prior criminal activity. RT at 2391, 5505. The first

accusation was that Pham had orchestrated an extortion plot in San Marino from inside the jail in order to provide information about the plot to the police. Respondent's Exhibit 2, Clerk's Transcript (hereinafter "CT") at 2425-28.  He allegedly asked people to make calls to a family threatening the kidnap of a child, so he could inform the police of the plot and demonstrate that he was a worthwhile informant.  *Id.* at 1032-34.  The trial court found that the evidence supporting the San Marino allegations would be cumulative of the evidence already offered to show Pham's character and motivation for being an informant.  RT at 2371, 2379, 2391.

The second accusation was that while Pham was working as an informant in the murder case against Chaleunsouk, he gave the prosecution and the defense conflicting information.  He allegedly told the prosecution that Chaleunsouk was guilty, and convinced the defendant to make a false confession.  *Id.* at 2423-24. Later, Pham supposedly told Chaleunsouk's public defender that Chaleunsouk was innocent and that when he had told police investigators that Chaleunsouk had not committed the murder, they told him to get Chaleunsouk to confess anyway.  *Id.* Finally, after receiving a visit in prison from the prosecutor of the case, Pham allegedly recanted the story he told the public defender and implicated Chaleunsouk once again.  *Id.*  With regard to this evidence, the trial court found that it was relevant but that its probative value was outweighed by undue consumption of time and the risk that it would create a substantial danger of confusing the issues and misleading the jury.  *Id*. at 5505.

### 1.      <u>Violation of Confrontation Clause Rights</u>

Petitioner claims that the exclusion of this impeachment evidence against witness Pham violated his right to effectively cross-examine him.  He claims that the evidence surrounding the San Marino kidnapping plot was essential to establish Pham's lack of credibility and would have demonstrated that Pham would say anything to get out of custody.  Petition at 13, 21.  Petitioner also claims that

1  evidence surrounding the accusations that Pham lied to the prosecutor in the

2  Chaleunsouk case would have demonstrated Pham's willingness to fabricate

3  information in order to curry favor with the prosecution.  *Id.* at 25.  While

4  Petitioner agrees with the state court's determination that the evidence was

5  relevant, he argues that the probative value of the evidence outweighed the

6  consumption of court time.  *Id.* at 26.

7       The California Court of Appeal is the highest state court to have addressed

8  the merits of this claim in a reasoned decision.  Therefore, this Court looks to the

9  analysis of the Court of Appeal in evaluating Petitioner's claim.  *LaJoie*, 217 F.3d

10  at 669 n.7.  The Court of Appeal considered Petitioner's Sixth Amendment rights

11  and applied federal law in its determination, relying on *United States v. Owens*,

12  484 U.S. 554 (1988).  In affirming the trial court's decision, the court performed

13  an extensive review of the record.  The court found that the impeachment evidence

14  admitted at trial sufficiently exposed Pham's character making the additional

15  impeachment evidence unnecessary.

16

17       This evidence showed that Pham continued to engage in
18  criminal conduct (stealing, attempting to bribe and escape) despite
   his pious assertion to the jury that he "wanted to do the right thing"
19  by testifying.  His negotiations and threats to Liroff and Dohi
   showed that his desire for a reduced sentence was a major
20  component of his desire to do "the right thing."  Pham's credibility
   and veracity on the witness stand were further impeached by his
21  denial of the escape attempt which the defense was allowed to prove.
   This impeachment evidence, which indicated Pham was lying on the
22  witness stand when giving sworn testimony, was far more probative
   than a past instance of lying to a defense investigator during an
23  unsworn interview in the Chaleunsouk case or the seriously
   conflicting evidence on Pham's role in the San Marino incident.
24  Since the evidence would not "reasonably have produced 'a
   significantly different impression of [the witness's] credibility'"
25  (*People v. Rodriguez* (1986) 42 Cal.3d 730, 751, fn. 2), there was no
   denial of the right of confrontation.
26
   *Heang*, 2005 WL 1840012, at *10.  (footnotes omitted)
27
        The Court of Appeal's finding that the additional impeachment evidence
28
   was unnecessary was reasonable because there was ample impeachment evidence

11

as to Pham's motives, lack of credibility and bias in the record.  There was already substantial evidence to suggest that Pham was an untrustworthy witness.  There was evidence before the jury of Pham's continued criminal activity which demonstrated that he was willing to break the law.  RT at 5210-11, 5370.  His willingness to lie on the witness stand was amply demonstrated by his testimony denying that he tried to bribe a civilian officer to help him escape, which was directly contradicted by the testimony of the officer to whom he had offered the bribe.  *Id.* at 5369, 5733.  The court's admission of a recording of the conversation between Pham and a prosecutor complaining that his efforts as an informant had not lead to a reduction in his sentence refuted his pious contention that he was motivated to "do the right thing" by testifying.  *Id.* at 5356 [Ex. 56]; *Id.* at 5466.  The admission of a rape accusation that Pham made against members of the Asian Boys gang suggested a separate motive of retaliation for testifying.  *Id.* at 5386-89.  In light of the volume of more reliable impeachment evidence regarding Pham's character that was before the jury, the Court of Appeal's affirmation of the exclusion of the additional impeachment evidence was not an unreasonable application of *Van Arsdall.*

Furthermore, the Court of Appeal's determination that the evidence was properly excluded because its probative value was "substantially outweighed" by the probability that its admission would "(a) necessitate undue consumption of time or (b) create substantial danger or undue prejudice, of confusing the issues, or misleading the jury," was also supported by the record.  *Heang*, 2005 WL 1840012, at *10.  Because of the disputed nature of the additional impeachment evidence, it would have taken the court a substantial amount of trial time to introduce the evidence fairly.  For example, to explore the allegations that Pham lied in the Chaleunsouk investigation, the trial court determined that the defense would have had to first put on testimony to prove Pham's original statements to the prosecution, as well as his subsequent statements to the defense investigator, and

his later statements to the prosecution recanting the statements to the defense.  RT at 5497.  The trial court also noted that the prosecution would then have had to be allowed to put on two or three witnesses to rebut that testimony.  *Id.*

Because this evidence was heavily disputed and it covered topics not relevant to the crime being tried, there was a reasonable risk that this substantial additional evidence would mislead the jury.  In light of that risk, the California Court of Appeal properly found that exclusion of the additional impeachment evidence was not an unreasonable application of *Van Arsdall* and did not violate the Petitioner's Sixth Amendment right to confrontation.  Petitioner is not entitled to federal habeas relief on his claims of Confrontation Clause violation with regard to the exclusion of impeachment evidence against Pham because the California Court of Appeal's rejection of the claim was neither contrary to, nor an unreasonable determination of, clearly established Supreme Court precedent.  *See* 28 U.S.C. § 2254(d).

Even assuming the exclusion of the two items of impeachment evidence was constitutionally impermissible, their exclusion did not have a substantial and injurious effect on the verdict and was therefore harmless.  *See Brecht*, 507 U.S. at 637.  While the excluded impeachment evidence might have given the jury more reason to question Pham's honesty, it would not have undermined the independent corroboration of Pham's testimony.

In part of its analysis of this claim, the Court of Appeal cited numerous instances where other evidence and testimony corroborated Pham's statement of Heang's participation.  *Heang*, 2005 WL 1840012, at *12-13.  It found that the evidence did not support the inference that Pham fabricated Heang's confession to the killing of Dinh.  *Id*. at 13.  This Court concurs with that determination.  Pham's testimony demonstrated knowledge of details of the crime that the police had not released to the public.  He testified that Heang told him the caliber of the gun he used in the murder and the number of shots fired at the victim.  RT at 5259.  Pham

also relayed information unknown by the police which they later verified.  Pham reported that Heang had told him that on their second trip to San Jose, their car broke down and they had to stay the night in a hotel with five stars on the sign.  *Id.* at 4711-13. Using Pham's information, the police located the hotel and found Heang's rental records.  *Id.* at 4610-15, 4712-13.  They also found the tow and impound records of the car they had used on that trip.  *Id.* at 4712.  Furthermore, the police found other witnesses such as Nhan Truong (Dreamer)[3] that corroborated the details of the story.

Additionally, witness testimony by Chris Zahedi, a fellow member of the Asian Boys gang, corroborated Pham's assertion that Heang had admitted to the murder of Dinh.  Zahedi testified that Heang admitted to the crime shortly after returning from San Jose.  RT 5150-53, 5156-58, 5181, 5183-84.  The details of the murder that Heang told Zahedi matched those Pham provided to the police.  *See id.*

Because the excluded evidence would not have rebutted the independent verification of the statements, any error related to the failure to admit additional impeachment of Pham did not have a substantial and injurious effect on the verdict.  Therefore, the California Court of Appeal's determination was neither contrary to, nor an unreasonable determination of, clearly established Supreme Court precedent.  See 28 U.S.C. § 2254(d).

## II.    Admission of Prior Inconsistent Statements

Petitioner claims that he was deprived of his Sixth Amendment right to confrontation because the trial court improperly admitted into evidence as a prior inconsistent statement witness Nhan Truong's (Dreamer) earlier taped statements given to the police regarding Heang's involvement in the murder of Dinh. Petitioner argues that the statement on the tape was hearsay, an out-of-court

---

[3]Dreamer claimed a total memory loss at trial. The court allowed the recording of his interview with police to be played for the jury.

14

statement introduced for the truth of the matter asserted, and should not have been admitted.  Petitioner challenges the trial court's determination that the witness was lying about his recent memory loss and argues that the admission of the prior statement violated his right to effectively cross-examine the witness.  Petitioner is not entitled to federal habeas relief on this claim.

A.   **Legal Standard**

When a witness gives "testimony that is marred by forgetfulness, confusion or evasion . . . the Confrontation Clause is generally satisfied when the defense is given the full and fair opportunity to probe and expose these infirmities through cross-examination."  *Delaware v. Fensterer*, 474 U.S. 15, 22 (1985).  This standard is not affected by testimony traditionally categorized as hearsay.  *United States v. Owen*, 484 U.S. 554, 560 (1988).   When the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his or her prior testimonial statements.  *California v. Green*, 399 U.S. 149, 157 (1970); *see Crawford v. Washington,* 541 U.S. 36 (2004).  The tactics to impugn the witness' statement when memory loss is asserted will of course not always be successful, but successful cross-examination is not a constitutional guarantee.  *United States v. Owen*, 484 U.S. 554, 560 (1988).

B.   **Analysis**

When first called to testify, Nhan Truong (Dreamer) answered a few preliminary questions.  RT at 4803-05.  From that point on, Truong testified that he was unable to answer further questions of the prosecutor, explaining that he could not remember his past because of prior drug use and a recent car accident.  *Id.* at 4811-14, 4807-09.  Prior to his court testimony, Truong had given a tape-recorded statement to Detective John Edwards regarding Heang's involvement in the murder of Dinh.  *Id.* at 4833 [Ex. 41, 41A].  At trial, the court found that Truong was feigning nonrecollection and admitted Truong's tape-recorded interviews into evidence as prior inconsistent statements.  *Id.* at 4830.

15

### 1.    State Court Evidentiary Error

Petitioner claims the trial court lacked the evidence to support a finding that Truong was feigning nonrecollection.  The California Court of Appeal is the highest state court to address the merits of this claim in a reasoned decision. Therefore, this Court looks to the analysis of the Court of Appeal in evaluating Petitioner's claim.  *LaJoie*, 217 F.3d at 669 n.7.  The Court of Appeal considered and rejected this claim, finding that a pattern of deliberate evasion on the part of the witness justified the trial court's credibility determination.  *Heang*, 2005 WL 1840012, at *16.  The Court of Appeal explained that, "[w]hen a witness's claim of lack of memory amounts to deliberate evasion, inconsistency is implied.  As long as there is a reasonable basis in the record for concluding that the witness's 'I don't remember' statements are evasive and untruthful, admission of his or her prior statements is proper."  *Id.* at *15 (citations omitted).

The Court of Appeal found that the trial court reasonably concluded from Truong's testimony that he was "deliberately evading questioning by feigning memory loss."  *Heang*, 2005 WL 1840012, at *16.  It noted that the trial court had the opportunity to observe Truong's demeanor first hand and to view his evasiveness.  *Id.* at *17.  The Court of Appeal cited numerous examples of contradictions in Truong's testimony stating:

> [Truong] expressed reluctance to testify and claimed he was being pressured when there was no evidence of pressure in the record.  He dodged questions by asking questions of the prosecutor and the court. He volunteered answers to bolster his assertion that he had no memory. At one point, he responded that he did not remember before the prosecutor said the name of the individual he was asking about. Finally, he testified that he was not afraid to testify against the Asian Boys at defendants' trial, but when he was interviewed by the police, he asked the officers several times not to use his name in the investigation and not to let it out that he was cooperating.  The court's finding that Dreamer's memory loss was feigned is supported by substantial evidence.

*Id.* at *17.

Under AEDPA, the district court must presume correct any determination of

a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  It is error for a federal court to review *de novo* a claim that was adjudicated on the merits in state court.  *See Price v. Vincent*, 538 U.S. 634, 638-43 (2003) (reversing judgment of Sixth Circuit granting habeas relief on *de novo* review where claims did not meet standards for relief under 28 U.S.C. § 2254(d)(1)).  Challenges to purely factual questions resolved by the state court are reviewed under 28 U.S.C. § 2254(d)(2); the question on review is whether an appellate panel, applying the normal standards of appellate review, could reasonably conclude that the finding is supported by the record.  It is not "the province of a federal habeas court to reexamine state-court determinations on state-law questions."  *Estelle v. McGuire* 502 U.S. 62, 63 (1991).  In reviewing a federal habeas petition, the court must inquire whether the admission of evidence was arbitrary or so fatally infected the proceedings that it rendered the trial fundamentally unfair.  *Id.*; *see Walters v. Maass*, 45 F.3d at 1357; *Colley v. Sumner*, 784 F.2d at 990.

Petitioner fails to introduce clear and convincing evidence to rebut the presumption that the trial court was correct in its determination that Truong was feigning nonrecollection.  He simply recounts Truong's rationale for his memory loss.  Petition at 37.  In contrast, the Court of Appeal's thorough review of Truong's testimony illuminated facts in support of  the trial court's conclusion.  *Heang*, 2005 WL 1840012, at *14.  Only after observing Truong answer numerous questions did the judge determine that Truong was feigning nonrecollection of his prior statements.  RT at 4805-15.  It was reasonable for the court to conclude that Truong's explanation that his memory loss was in part due to a car accident was untrue since he was never hospitalized for the accident.  *Id.* at 4807.  Additionally, Truong demonstrated his evasiveness on numerous occasions, particularly when he refused to state that he had previously been involved with the Asian Boys gang.  *Id.* at 4806.  On one occasion, Truong said he did not know the person in question

17

1   before he even heard the name.  *Id.* at 4808.  Because there are numerous examples

2   of Truong's evasiveness in the record, the Court of Appeal, applying the normal

3   standards of appellate review, could reasonably conclude that trial court's

4   determination that Truong feigned nonrecollection is supported by the record.

5   Therefore, the Court of Appeal's review is reasonable under 28 U.S.C. §

6   2254(d)(2).

7                   **2.      Violation of Confrontation Clause Rights**

8           Petitioner also claims that the admission of Truong's prior statements to the

9   police into evidence violated Petitioner's confrontation rights.  He claims that he

10  was denied the right to confront and cross-examine Truong because Truong could

11  not remember the conversation on the tape.  Petitioner also claims that he was

12  denied a fair trial because of the use of the tape.  *Heang*, 2005 WL 1840012, at

13  *17.

14          The Court of Appeal considered and rejected this claim ruling the

15  admission of the tapes of Truong speaking to the police did not violate the

16  Confrontation Clause because Truong was available for cross-examination.  *See*

17  *Heang*, 2005 WL 1840012, at *18.  Therefore, Petitioner was "not denied the

18  rights of confrontation and cross-examination" or the "right to a fair trial."  *Id.*

19  Citing *United States v. Owens*, 484 U.S. 554, 562 (1988) the Court of Appeal

20  stated, "[T]he Confrontation Clause guarantees only an opportunity for effective

21  cross-examination, not cross-examination that is effective in whatever way, and to

22  whatever extent, the defense might wish. . . . When the declarant is present at trial

23  and subject to unrestricted cross-examination, the traditional protections of the

24  oath, cross-examination, and the opportunity for the jury to observe the witness'

25  demeanor satisfy the constitutional requirements."  *Id.* (citations and quotations

26  omitted).

27          A witness is regarded as "subject to cross examination when he or she is

28  placed on the stand, under oath, and responds willingly to questions."  *Owens*, 484

18

1    U.S. at 562.  The right to cross-examine a witness is not denied when the witness

2    testifies as to his current belief but is unable to recollect the reason for that belief.

3    *Id.* at 560.  The right is satisfied when the defendant has the opportunity to address

4    such matters as the witness' bias or "the very fact that he has a bad memory."  *Id.*

5    Similarly, in *California v. Green*, Justice Harlan wrote "[t]he fact that the witness,

6    though physically available, cannot recall either the underlying events that are the

7    subject of an extra-judicial statement or previous testimony or recollect the

8    circumstances under which the statement was given, does not have a Sixth

9    Amendment consequence."  399 U.S. 149, 188 (1970).  Even though the witness is

10   practically unavailable for cross-examination on the relevant facts, the witness is

11   still available, and the Confrontation Clause is satisfied.  *Id.* at 188-89.

12       Truong was present at trial, and subject to cross-examination.  RT at 4803-

13   37.  Truong testified that he had no recollection of many of the statements he made

14   to the police in his interview, or even if the he recognized his own voice on the

15   tape.  *Id.* at 4834-36.  He claimed that he did not remember much from that time in

16   his life due to drug use and a car accident.  *Id.* at 4811-14, 4807-09.  Because

17   Truong was available for cross-examination, his failure to recollect the substance

18   of his interview with the police did not make him unavailable and did not result in

19   a Confrontation Clause violation.  *See Green,* 399 U.S. at 188-89.

20       Petitioner is not entitled to federal habeas relief on his claim of

21   Confrontation Clause violation with regard to the admission of Nhan Truong's

22   inconsistent statements because the California Court of Appeal's rejection of the

23   claim was neither contrary to, nor an unreasonable determination of, clearly

24   established Supreme Court precedent.  *See* 28 U.S.C. § 2254(d).

**III.    Lying-in-Wait as a Special Circumstance**

26       Petitioner contends that the special circumstance of lying-in-wait used to

27   enhance his sentence must be stricken because the definition of lying-in-wait used

28   in this case, which fails to require actual physical concealment, "is so broad so as

to include within its reach nearly all intentional killings." Petition at 47. He claims that it violates the Eighth Amendment because it fails to sufficiently narrow the class of murders who would qualify for the enhancement. Petitioner is not entitled to federal habeas relief on this claim.

### A.   Legal Standard

A capital sentencing scheme must, in short, provide a " 'meaningful basis for distinguishing the few cases in which [the penalty] is imposed from the many cases in which it is not.' " *Godfrey v. Georgia,* 446 U.S. 420, 427 (1980). This means that if a state wishes to authorize capital punishment, it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty. *Id.* at 428.

The Court has refused to extend the Eighth Amendment limitations placed on death penalty sentences to lesser punishments. *Harmelin v. Michigan,* 501 U.S. 957, 994-96 (1991) (refusing to extend the "individualized capital-sentencing doctrine" of the Court's death penalty jurisprudence to an "individualized mandatory life in prison without parole sentencing doctrine"). Furthermore, the Ninth Circuit specifically determined that the lying-in-wait circumstance was not unconstitutional under the Eight Amendment. *Morales v. Woodford*, 388 F.3d 1159, 1175 (9th Cir. 2007) (holding that lying in wait contains three elements: "(1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage," that are not found in every first degree murder conviction). In *Morales,* the Ninth Circuit found that the lying-in-wait circumstance is not "overly broad such that it "appl[ies] to every defendant convicted of a murder." *Id.*

### B.   Analysis

The California Court of Appeal is the highest state court to address the merits of this claim in a reasoned decision. Therefore, this Court looks to the

analysis of the Court of Appeal in evaluating Petitioner's claim. *LaJoie*, 217 F.3d at 669 n.7.

The Court of Appeal considered and rejected this claim stating, "Defendants recognize that the California Supreme Court and the Ninth Circuit Court of Appeal have rejected this claim and affirmed the constitutionality of California's lying in wait special circumstance. (See, e.g., *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1148-1149; *Morales v. Woodford* (9th Cir.2003) 336 F.3d 1136; *Houston v. Roe* (9th Cir.1999) 177 F.3d 901.)" *Heang*, 2005 WL 1840012, at *19.

The limitations the Supreme Court has placed on capital sentences do not apply to Petitioner's punishment because Petitioner was not sentenced to death, but instead to a term in prison. Furthermore, Petitioner's claim regarding the use of lying-in-wait as a special circumstance has been specifically addressed and denied by the Ninth Circuit. Therefore, the Court of Appeal's denial of his claim was not contrary to established Supreme Court precedent in *Harmelin* and *Godfrey*.

Petitioner is not entitled to federal habeas relief on his claim of Eighth Amendment violation with regard to the lying-in-wait special circumstances because the California Court of Appeal's rejection of the claim was neither contrary to, nor an unreasonable determination of, clearly established Supreme Court precedent. See 28 U.S.C. § 2254(d).

## IV.    Cumulative Error

Petitioner claims that the foregoing errors considered cumulatively warrant relief. Petitioner is not entitled to federal habeas relief on this claim.

### A.    Legal Standard

In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still prejudice a defendant so much that his conviction must be overturned. *Alcala v. Woodford*, 334 F.3d 862, 893-95 (9th Cir. 2003) (reversing conviction where multiple

21

constitutional errors hindered defendant's efforts to challenge every important element of proof offered by prosecution).  Where there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation. *Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002).  "[A]ny number of 'almost errors,' if not 'errors,' cannot constitute error." *United States v. Haili*, 443 F.2d 1295, 1299 (9th Cir.  1971).

### B. <u>Analysis</u>

Because there was no constitutional error found in the preceding claims, there is no cumulative error warranting relief.  Therefore, Petitioner's claim of cumulative error must be denied.

### <u>CONCLUSION</u>

After a careful review of the record and pertinent law, the Petition for Writ of Habeas Corpus is denied.  The Clerk shall enter judgment in favor of Respondent and close the file.

IT IS SO ORDERED.

DATED: July 29, 2009

_____
JEFFREY S. WHITE
United States District Judge

1

UNITED STATES DISTRICT COURT

2

FOR THE

3

NORTHERN DISTRICT OF CALIFORNIA

4

5

6    VAN HANG HEANG,                              Case Number: CV07-00980 JSW

7              Plaintiff,                          **CERTIFICATE OF SERVICE**

8       v.

9    JEANNE WOODFORD et al,

10             Defendant.

11   _____/

12   I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District
     Court, Northern District of California.

13

14   That on July 29, 2009, I SERVED a true and correct copy(ies) of the attached, by placing said
     copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing

15   said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery
     receptacle located in the Clerk's office.

16

17

18   Van Hang Heang
     C.S.P. B1-201

19   P.O. Box 5005
     Calipatria, CA 92233

20   Dated: July 29, 2009                          *Jennifer Ottolini*

21                                                 Richard W. Wieking, Clerk
                                                   By: Jennifer Ottolini, Deputy Clerk

22

23

24

25

26

27

28